FIRST NATIONAL BANK OF BRAZIL *v.* STEVENSON.

[No. 13,460.   Filed October 9, 1929.]

A. W. *Knight* and Edward H. *Knight,* for appellant.
A. Carl *Miller* and M. B. *Hottel,* for appellee.

LOCKYEAR, J.—The complaint alleges that, on September 22, 1917, the appellant sold and conveyed to Hugh Stevenson and his wife, the appellee herein, as tenants by entireties, certain real estate in Brazil, Indiana, at and for a fixed and agreed consideration of $6,000. That the said Hugh Stevenson paid the appellant herein the sum of $3,000 on the purchase price,

but has never paid any part of the balance of said purchase price. That on October 26, 1925, the said Hugh Stevenson died, and the appellee herein has ever since been, and is now, the sole owner of said real estate, and the appellant herein demands judgment for the unpaid purchase price of said real estate, and that the same be declared and found to be a lien upon said real estate, and asks that the same be sold to satisfy the said lien and debt.

The appellee filed her answer in five separate paragraphs, the first being a general denial, the second alleging payment, the third alleging satisfaction and payment by the delivery of certain bonds to the appellant, and the fourth alleging that payment of the balance of the purchase price was so blended with other transactions between the appellant and the appellee's deceased husband extending over a period of eight years, upon which various sums of money had been paid, that the precise amount of the remaining portion of the purchase price could not be correctly ascertained.

The fifth paragraph is similar to the third in that it alleges satisfaction and payment by the delivery to the appellant of certain bonds, but sets out the facts and circumstances in detail concerning the delivery of said bonds in settlement of the debt.

The facts upon which this case turns can best be stated by quoting from the testimony of the main witnesses in the case, such testimony being in substance, as follows: Harry F. Bucklin says that he is president and cashier of the appellant bank; that, on September 22, 1917, he was cashier and Hugh Stevenson was president, he being the husband of the appellee; "Mr. Stevenson told me the Board had agreed to sell the property to him for $6,000, and it was made a matter of record at or about that time; about the first of the following year, he was to pay $3,000 cash and the bank was to loan him the $3,000

balance; about January 2, 1918, he paid $3,000 on the purchase price by money borrowed from the Citizens Building and Loan Association, and, as evidence of the balance, he gave the bank his note; on February 14, 1919, $500 was paid on the balance of the $3,000; Mr. Stevenson handled the whole transaction and took up his old note and no one else had anything to do with it; the $3,000 renewal note was renewed at maturity for $2,500 on January 21, 1921, $500 being paid on it; on January 22, 1922, he borrowed $500 additional and renewed the previous note by a new note of $3,000; Stevenson acted both as borrower and lender in this case; on April 4, 1923, the last note was merged with the other indebtedness and became a part of a new $10,000 note which Stevenson gave the bank; he owed us other notes at that time, and there might have been some cash in it; this last note of $10,000 has never been paid, and no interest has been paid on it since March 3, 1925; at the time of Mr. Stevenson's death, the bank also held his note for $3,600, the only one besides the $10,000, making a total indebtedness that Stevenson owed the bank of $13,600.''

Kenneth V. Brownell testified that he lived at Brazil and is now a state bank examiner; from 1920 to November, 1926, he was assistant cashier of the First National Bank of Brazil; after Mr. Stevenson's death, Harry F. Bucklin was in charge of the bank as cashier. The witness, Brownell, says that he was the son-in-law of Mr. Stevenson, and, after the latter's death, October 28, 1925, says: "I talked with Mr. Bucklin concerning a shortage of bonds at the bank caused by Mr. Stevenson. Mr. Bucklin told me that certain bonds and securities belonging to the Bridgeton Bank were missing from a box, that there had been heavy withdrawals on the First National Bank and the Bridgeton Bank held receipts for these bonds, and that a discovery may result in the closing of both banks. He asked me to see if Mrs. Steven-

son had any means or way of making this shortage good, and if she did have, she and her property would be relieved of any obligation to the bank, and she would be put in the clear. I told him I would see her. Shortly afterward, I saw Mrs. Stevenson, with whom I was living, and repeated my conversation with Mr. Bucklin regarding the missing bonds that belonged to the Bridgeton Bank and whether she could make some restitution to the bank, and, if possible to do so, she and her property would be relieved of any obligation to the bank and she would be put in the clear. She replied that she would find out what insurance she had and would be willing to do it; I then told Mr. Bucklin that Mrs. Stevenson would determine how much insurance she had, and, if he could determine the exact amount of the shortage, that she would be willing to turn over this insurance or bonds of like amount if her property and herself would be released from any obligation to the bank, and she would be put in the clear; Mr. Bucklin said all right, and he reported the amount of the missing bonds as about $13,243, and other shortage was about $1,000. At that time, Mrs. Stevenson had the home and an equity in the farm as all her real estate. I reported to her the amount of the bond shortage as indicated by Mr. Bucklin, and told him the amount of her insurance. Mrs. Stevenson then procured about $14,000 in bonds, which were turned over to Mr. Bucklin at the bank and retained by it."

Eva E. Stevenson, the appellee, testified: "I am the widow of Hugh Stevenson. A short time after my husband's death, Mr. Brownell came to me and said Mr. Bucklin had told him there was a shortage of bonds, and that there had been a heavy withdrawal from the bank, and that these bonds affected the Bridgeton Bank, and asked if I could in any way help to relieve the situation at the First National Bank, and that if I would, I would be relieved and my property of any obligation to the

bank. I said I would try and see what I could do, upon ascertaining the amount of my insurance. A short time later, when Mr. Bucklin had found out approximately what bonds were missing and I had found out about the insurance, I told Mr. Brownell I was willing to do that, provided I would be relieved of any obligation to the bank or my property. I used my insurance money for procuring bonds, and Mr. Brownell got them through Mrs. Ross. He told me he had delivered them to Mr. Bucklin at the First National Bank. The bonds were never returned to me. At that time my real estate consisted of the property I live in, which is described in the complaint and an equity in a farm."

It is contended by the appellant that the payment by the appellee of $14,000 to the bank had nothing whatever to do with the old balance due on the real estate, but was for the sole and only purpose of making good some shortages and misplacement of bonds for which her husband was responsible. The trial court seems to have taken the view that the appellee paid the $14,000 to clear herself and her property of all claims that the bank might have against her.

There is no evidence that she knew of the claim that the bank had a lien on her real estate; there is no showing of any reason why the land was conveyed to her and her husband as tenants by entireties. The note for the balance of the purchase price was never signed by her; it was merged into another note for a large amount to wit: a $10,000 note evidencing other indebtedness, and signed only by her husband. There is no showing that she was in any way legally bound to make good any misappropriation by her husband of the bonds belonging to another bank, the presumption is she was not legally bound, but, to get rid of everything that the bank had against her, she gave up the $14,000. The appellant does not offer to place the appellee in *status quo* by offer-

ing to return the $14,000 provided she pays the bank $2,500 and interest.

Having reached the conclusion that the court had a right to conclude under the evidence that the payment of $14,000 settled all claims the appellant had against the appellee, it is not necessary for us to decide any question as to whether a vendor's lien was retained in the first instance to secure the balance of the purchase price of the real estate in question.

Judgment affirmed.

McMahan, C. J., not participating.